Filed 2/26/21  525-655 Hyde Street CNML Props v. City of Oakland etc. CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| 525-655 HYDE STREET CNML PROPS., LLP et al., <br><br>    Petitioners and Respondents, <br><br> v. <br><br> CITY OF OAKLAND DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT RENT ADJUSTMENT PROGRAM, <br><br>    Respondent. <br><br> JULIE AMBERG et al., <br><br>    Real Parties in Interest and Appellants. | A156463 <br><br> (Alameda County Super. Ct. No. RG17862841) |

Real parties in interest, three residents of an Oakland apartment building (Tenants), appeal from an adverse judgment in this administrative mandamus proceeding filed by the owner of the building (Owner).  Owner, after making substantial repairs and improvements to the building, filed a "Petition for Exemption" from Oakland's Rent Adjustment Ordinance, pursuant to its "substantial rehabilitation" provisions.  Following a hearing, at which Owner and numerous tenants represented by counsel submitted evidence, the hearing officer found the dollar amount of qualifying repairs

1

and improvements insufficient to meet the exemption requirement.  Owner appealed to the Oakland Housing, Residential, Rent and Relocation Board (Board), which upheld the decision.

Owner then filed a writ petition, which the trial court granted, concluding the hearing officer and Board had made several legal errors.  The court remanded the matter for reconsideration in accordance with its rulings.[1]

Tenants challenge one of these rulings, as well as an order augmenting the administrative record.[2]  We affirm.

## DISCUSSION[3]

### *Mootness*

We first address Tenants' claim that the case has been rendered moot by Oakland's elimination of the substantial rehabilitation exemption.

The pertinent circumstances are as follows:

---

[1]  The remand order states:

"Consistent with Code of Civil Procedure [section] 1094.5(f), the court orders the City of Oakland Rent Board to reconsider the case in light of the court's opinion and judgment.  The judgment shall not limit or control in any way the discretion legally vested in the respondent Board.  If permitted by its procedures, the Rent Board may direct the Hearing Officer to conduct a further hearing.  If permitted by its procedures, the Rent Board may reconsider the entire matter or only the issues implicated by this order.  The court expressly does not direct the Rent Board to grant the petition for a Certificate of Exemption."

[2]  Although the City of Oakland appeared in the trial court and urged that the Board's decision be upheld, the city did not appeal from the trial court's judgment and has not appeared, as amicus or otherwise, in this appeal.

[3]  We discuss the relevant facts and procedural background in connection with our discussion of the issues on appeal.

2

Owner filed for a substantial rehabilitation exemption on November 10, 2014.

Three years later, on November 28, 2017, the city enacted a 180-day moratorium on such exemptions, which it extended for another 180 days so staff could complete a report with options and recommendations. (Oak. Ord. No. 13523.[4])

The staff report, dated August 14, 2018, discussed three options—a three-year moratorium allowing further study and analysis, restricting the exemption to vacant and uninhabitable units, and eliminating the exemption. The report observed that most rent control jurisdictions no longer have such exemptions and provide other means for owners to recoup capital improvement costs, which Oakland also allows.

Following a public hearing on September 17, the city council extended the moratorium an additional 180 days and voted to eliminate the exemption.

On March 21, 2019, the city council adopted ordinance No. 13523, eliminating the exemption. (Oak. Ord. No. 13523.) The ordinance amended Municipal Code section 8.22.030 to read in pertinent part:

"A. Types of Dwelling Units Exempt. The following dwelling units are not covered units for purposes of this chapter. . . : [¶] . . . [¶]

"6. Substantially rehabilitated buildings. This exemption shall apply only to buildings where the rental property owner submitted an application for a certification of exemption to the Rent Adjustment Program prior to October 20, 2017, and which have been issued a certificate of exemption from the Rent Adjustment Program." (Oak. Ord. No. 13523, § 1, A(6), underscoring omitted.)

---

[4] We take judicial notice of the city's legislative actions and the staff reports prepared in connection therewith. (Evid. Code, § 452.)

There is no dispute Owner filed its application long before October 20, 2017. Tenants assert that not only must an application have been filed by that date, but such application also must have been granted by that date.

The plain language of the ordinance does not support Tenants' reading. (See *L.G. v. M.B.* (2018) 25 Cal.App.5th 211, 227 [it is a "general principle that the plain language of a statute is controlling"].) As a grammatical matter, the October 20, 2017 date pertains only to the application for a substantial rehabilitation exemption. Moreover, the ordinance easily could have stated that both an application for such an exemption must have been filed *and* a certificate of exemption must have been obtained, by October 20, 2017. It does not, however, so state. (See *The Internat. Brotherhood of Boilermakers, etc. v. NASSCO Holdings Inc.* (2017) 17 Cal.App.5th 1105, 1117 [although legislature could have defined key term of statute to include certain employment action, it did not do so, and court would not read statute as though it included such definition].)

The most plausible reading of the plain language, then, is that the city council established a cut-off date for exemption applications, thus allowing timely filed applications to be processed, but barring any further applications and ensuing exemptions.

Tenants also point out Owner's application was denied by the hearing officer and the Board. But there is no suggestion in either the ordinance or staff reports that a timely applicant receiving an adverse ruling from a hearing officer would be barred from pursuing either the administrative appeal expressly provided for by the Rent Adjustment Ordinance or foreclosed from seeking judicial review of a Board decision.

4

We therefore conclude, since Owner filed an application for a substantial rehabilitation exemption well before the October 2017 deadline, the instant proceeding is not moot.

### *Order Augmenting Administrative Record*

We next address Tenants' challenge to the trial court's order augmenting the administrative record to include Owner's "Brief on Appeal" submitted to the Board in support of its administrative appeal. We review the court's order for substantial evidence.[5] (See *Consolidated Irrigation Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 197–201 (*Consolidated Irrigation*) [affirming order augmenting record, as substantial evidence supported trial court's finding that memoranda not included in record had, in fact, been submitted to local governing agency].)

The motion to augment was made in response to assertions by the City and the Tenants in their opposition to the writ petition, that Owner had forfeited an issue—specifically, that the hearing officer had erred in using one construction cost figure ($127) for both interior living space and balcony

---

[5] "A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied. (See *People v. Johnson* (1980) 26 Cal.3d 557, 578. . . .) Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.) A trial court's "conclusions of law" in connection with a motion to augment "are subject to independent review on appeal." (*Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 65 (*Madera*), disapproved on another ground in *Neighbors for Smart Rail v. Exposition Metro Line Authority* (2013) 57 Cal.4th 439, 457.) However, as we explain, we are not dealing here with an issue of law, but with a challenged finding of fact.

space, rather than a lower figure for balcony space ($41.16)—because it had not raised the issue before the Board. At the hearing on the writ petition, Owner provided the trial court with a file endorsed copy of its "Brief on Appeal," wherein Owner had raised the exact issue the City and the Tenants claimed was forfeited. The City declined to concede the brief was in the record.

Owner therefore filed a post-hearing motion to augment the record. This was supported by a detailed declaration of the attorney who had prepared the administrative appeal brief and had extensive experience with Board filing requirements. He explained that he had instructed his staff to file the brief, on staff's return to his office he/she confirmed the brief had been filed, and counsel was handed and retained in his possession a "blue ink" file-endorsed copy of the brief. Counsel acknowledged he had reviewed the administrative record after it was prepared. But he had not noticed the omission of the brief then, or later when he prepared the memoranda in support of the writ petition as he had had no occasion to refer to it. He also recounted this was not the first time he had experienced a situation where a filed document had been misplaced by the Board. He further stated that, at the time, Board rules did not require service of such briefs on real parties.

The City opposed the motion to augment, submitting declarations of two city employees that the city had no record of receiving the brief. Real parties also maintained they had no copy of the brief.

After considering all the evidence before it, the trial court granted the motion, pointing out the copy of the brief provided with the motion was "file stamped 'RECEIVED CITY OF OAKLAND RENT ARBITRATION PROGRAM 2016 MA- 4 PM 2:52.' " The court also observed neither the City, nor real parties, had provided any evidence that Owner had "used the City's

6

self-file-stamp procedure" but then failed to leave a copy for the Board or had deliberately falsified the file stamp. The court ruled "substantial evidence" supported "a finding that the [Owner] filed the brief and that the City inadvertently mis-filed or lost the brief." It further found there was "no indication that the City intentionally withheld the Appeal Brief from the administrative record."

On this record, the trial court's augmentation order is amply supported.

Citing to *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, Tenants claim the trial court erred "as a matter of law" in granting the motion. Tenants misperceive the distinction between augmenting a record with *evidence not presented* during the administrative proceedings and augmenting a record to ensure it is complete and includes all materials that were presented *during* the administrative proceedings. (See *Consolidated Irrigation, supra,* 204 Cal.App.4th at p. 198 [pointing out the "importance of distinguishing between documents that belong in the record of proceedings versus documents that might be admissible as extra-record evidence"]; see generally California Practice Guide-Administrative Law, "Pretrial and Trial of Mandamus Cases, § 20:195 (The Rutter Group 2020) ["If petitioner contends the record certified by the agency is incomplete, the appropriate remedy is a motion to augment the record."].)

*Western States* does, indeed, place constraints on extra-record evidence pertaining to the merits of the matters before the administrative tribunal that is proffered after-the-fact during judicial review. But the case has no bearing on a motion to augment of the sort made here—to correct the administrative record to include a document that the trial court found, on substantial evidence, was submitted to the Board but was inadvertently not

7

included in the administrative record. (See *Consolidated Irrigation, supra,* 204 Cal.App.4th at pp. 198–199.)

As for Tenants' assertion that Owner did not show reasonable diligence in seeking to augment the record, we must presume the trial court found otherwise as there is substantial evidence to support such a finding. (See *Madera, supra,* 199 Cal.App.4th at pp. 65–66 [in connection with rulings on motions to augment, appellate court applies traditional presumptions on appeal, including that trial court made all requisite findings where substantial evidence supports such implied findings].) Moreover, "it is within the province of the trial court, sitting as the trier of fact, to decide factual questions such as reasonable diligence and the persuasiveness of the evidence presented," and we "will not not second-guess the implied finding[] made by the trial court." (*Id.* at pp. 71–72.)

Tenants further maintain their "due process" rights were impinged by the augmentation order. But they provide no specifics. As the trial court pointed out, augmentation was not sought to bolster any merits argument. Rather, it was sought solely to rebut a claim of forfeiture. We fail to see how the trial court's proceeding to the merits of the issue, otherwise fully briefed by the parties and based on evidence indisputably in the record, prejudiced Tenants in any respect.

Finally, Tenants spend considerable time rearguing the evidence, urging that the declarations of city staff should have been given controlling weight and the declaration of Owner's counsel should have been viewed with skepticism and discounted. However, even where a factual matter is tried on declarations and affidavits, credibility and weight are matters for the trial court, not the Court of Appeal. (See *Consolidated Irrigation Dist., supra,* 204 Cal.App.4th at p. 198 ["Appellate courts routinely apply the substantial

evidence standard to findings of fact made by a trial court based on affidavits and declarations without any oral testimony."]; *Escamilla v. Department of Corrections & Rehabilitation* (2006) 141 Cal.App.4th 498, 514–515 ["we do not evaluate the credibility of the witnesses or otherwise reweigh the evidence"; rather, " 'we defer to the trier of fact on issues of credibility' "].)

We therefore conclude there is no merit to Tenants' challenge to the augmentation order.

Tenants have not challenged the merits of the trial court's ruling on the issue found not to have been forfeited—namely, its ruling that the hearing officer, and in turn the Board, erred in using a single construction cost number, $127, for the entirety of the square footage. Accordingly, we do not consider this issue further, and the trial court's ruling on this issue is controlling on remand.

### The Hearing Officer's Use of "Table B"

The requirements for a substantial rehabilitation exemption were set forth in former Oakland Municipal Code section 8.22.030, which read in pertinent part:

"Exemptions for Substantially Rehabilitated Buildings.

"a. In order to obtain an exemption based on substantial rehabilitation, an owner must have spent a minimum of fifty (50) percent of the average basic cost for new construction for a rehabilitation project and performed substantial work on each of the units in the building.

"b. The average basic cost for new construction shall be determined using tables issued by the chief building inspector applicable for the time period when the substantial rehabilitation was completed. . . ." (Former Oak. Mun. Code, ch. 8.22, § 8.22.030, subd. (B)(2)(a)–(b).)

9

These requirements gave rise to the principle issue before us—whether a document the parties and the hearing officer referred to as "Table B" was a "table[] issued by the chief building inspector applicable for the time period when the substantial rehabilitation was completed."[6] (Former Oak. Mun. Code, ch. 8.22, § 8.22.030, subd. (B)(2)(b).)

This document is entitled " 'Quarterly Cost Indexes (1926=100).' " We discuss its specific attributes in subsequent paragraphs. At this point, we recount the record of its appearance in the administrative proceedings:

The parties were notified that they were required to disclose evidence seven days prior to the administrative hearing and cautioned that any evidence not disclosed could be excluded. Neither party disclosed Table B.

At the hearing, the Tenants called as their witness, David Harlan, an Engineering Manager with the city. Before counsel asked any questions, the hearing officer inquired about another document, which the parties and hearing officer referred to as "Table A" and is entitled "City of Oakland Building Services Construction Valuation For Building Permits Effective Aug. 1, 2009." (Boldface & fns. omitted.)

The hearing officer (HO) began:

"[HO]: . . . [L]et me ask you first, and then Ms. Mira [(the Tenants' counsel)] will be able to ask you questions, is the latest table put out by the City of Oakland [the] Construction Valuation dated August 1, 2009 [Table A]?

"Harlan: Yes, that's the table that we currently use.

"[HO]: Okay. Let me turn it over to Ms. Mira. . . ."

---

[6] Solely for ease of reference, we continue to refer to this document, and others, by the labels given them by the parties, the hearing officer, and the trial court.

10

Counsel proceeded to ask Harlan a number of questions about applying for a building permit, including describing the scope of work and the value of the job, and the calculation of permit fees. The hearing officer finally asked counsel not to belabor points that had "nothing to do with the essential question that we're looking to have answered," namely whether Owner had made sufficient expenditures to qualify for the substantial rehabilitation exemption.

Counsel then asked Harlan how someone would figure out how much it would cost to build a residential structure, such as the small apartment building in question. This engendered the following colloquy:

"Mira: . . . How would I figure how much that would cost me?

"Harlan: For permit fees?

"Mira: Just the whole job, complete job, how much would it cost me for a 16-unit building with a square footage of 13,336? . . .

"Harlan: So the City doesn't play a role in that. I mean I can hazard a guess but—

"Mira: Mm-hmm.

"Harlan: —it's not our—it's not the City's role to help people identify how to pay for something or how much it's going to cost to build something. [¶] . . . [¶]

"[HO]: . . . [S]o you said it's not the City's role to determine—

"Harlan: Yeah.

"[HO]: —how much it would cost to build the building.

"Harlan: Yeah, that's right. Yeah, that's a relationship between the owner and the contractor. . . ."

Counsel then asked Harlan to "describe" Table A (the document entitled "City of Oakland Building Services Construction Valuation For

11

Building Permits Effective Aug. 1, 2009," boldface & fns. omitted).  Harlan replied, "It's a valuation table used by staff to help assign permit valuations for the purpose of calculating the permit fee."  He agreed with counsel that was "just for the permit fee" and "not for how much actual construction would cost."

Counsel again asked Harlan how "would you figure out what the actual construction costs are."  Harlan again replied that was "between the property owner and their licensed contractor."  Counsel then asked if there were "industry standards."  Harlan said, "[y]es," and added "that's where these numbers [on Table A[7]] c[o]me from."

At this point, counsel, for the first time, mentioned Table B (the document entitled "Quarterly Cost Indexes (1926=100)"), stating she was not presenting it as evidence but "to help the expert get to [the] point."  She asked Harlan what the document was.  He responded:  "This is an index that just shows the variation in pricing for certain regions over a period of time. Generally, the trend is upward, but maybe it goes down sometimes."

Owner's counsel objected on grounds the document had not been disclosed.  Mira repeated she was not asking to put it into evidence but was "just asking him if he knows what it is and if he can describe it."  Counsel again objected, and the hearing officer ruled it could be used only to refresh Harlan's recollection.

Harlan proceeded to answer:  "I've seen these indexes before and I don't know if I've calculated anything off of them. . . .  I've looked at this before and

---

[7]  It is clear Harlan was referring to Table A, as he was referring to "exhibit 138," which was a copy of Table A.  In addition, tenants' counsel had not yet mentioned Table B.

you can pick out the indices for different years for the same region and come up with a differential." This led to the following colloquy:

"Mira: So I guess what I'm trying to get to is, if I were to have built a building in . . . 2009, is it fair to say that that same cost in 2009 wouldn't be the same cost in 2014?

"[Counsel for Owner]: Objection. I don't think this witness has been qualified to talk about costs. . . . [¶] . . . [¶]

"[HO]: Well, let me ask you this: Are you generally familiar with the trends of construction costs either up or down in the past six years in the City of Oakland?

"Harlan: No. I really can't say—it's fluctuated is my understanding. So I'm sure it held flat for awhile and then it went down, maybe it went up.

"[HO]: Do you know—this is really the ultimate question: Do you know whether it would cost more to build the building [in question] today than it would in 2009?

"Harlan: I couldn't speak to that."

Tenants' counsel then asked Harlan, "does inflation play a role in construction costs." Another objection by Owner was overruled, and Harlan answered: "Well, I can speak to how it affects the cost indices in this source that we use, Marshall Swift. So it plays a role in—there's materials and labor are the big components of these indices and so inflation plays a role in both of those to varying levels of degrees depending on what the description of work is, whether steel costs more. Everything is down to like bags of concrete and how many pounds of steel and how many hours it takes to do something and this thing [referring to Exhibit 138, which is Table A] is a summary of a binder that's about this thick."

13

Counsel then asked, as a "hypothetical," whether it would cost more to remove stucco with asbestos underlaying it, than without. Harlan replied: "I would think so." When the hearing officer asked, "how much more," Harlan could not provide a percentage "because there's probably different concentrations . . . that might trigger a certain type of abatement . . . I'm not sure." Counsel then asked a hypothetical about the cost of re-tiling a bathroom. Harlan answered: "I'd have to check with one of the counter staff people." Counsel then asked about a "range" of costs for installing windows. Harlan again testified: "I'd have to check with one of our inspectors." The hearing officer eventually interjected: "Look, I mean he has no control over the inspectors and let me tell you, I mean re-tiling a bathroom, I mean there are very expensive tiles; there are cheap tiles. I don't see how this would be at all helpful." Harlan then volunteered: "Well, I can say that generally, we would ask the applicant to tell us what their cost is for those types of small projects. Those are small projects and we would usually rely on that—on what they've presented to us.

With that, counsel stated she had no further questions for Harlan. Owner's counsel asked no questions.

Table B (the document entitled "Quarterly Cost Indexes (1926=100)") was not mentioned again until closing summation, when tenants' counsel argued: "So the second reason why the exemption should be denied is because the City of Oakland, the Rent Adjustment Program, actually uses the cost indexes to adjust the cost for when the actual construction happened," and cited to three hearing decisions.[8] She continued, "I believe that in this case it would be unfair to use a 2009 building cost [(Table A)] when the

---

[8] These were *Weinberg v. Tenant*, *Promes v. Fehr,* and *Young v. Beasley*, which we discuss in subsequent paragraphs.

14

[rehabilitation] construction happened in 2014 and 2013." Counsel acknowledged "Mr. Harlan couldn't testify to that," but asserted "it's common knowledge that inflation affects things." "So," counsel went on, "based on how calculations have been done in these previous cases, new construction based on the cost indexes for 2009 and for 2014, new construction has increased by 1.1.%."

The hearing officer expressed some difficulty in following counsel. Counsel then referred the hearing officer to Table B, stating "you don't use . . . [the] valuation chart [(Table A),] but I'm sure you're familiar with these, the quarterly indexes [(Table B)]." Counsel proceeded with a detailed, step by step argument as to how the hearing officer should use Table B to calculate a 2014 comparative cost number.

When Owner objected that Table B was not in evidence, the hearing officer now stated he would take "official notice of the documents that I'm supposed to use to do the computation." When Owner again objected, the hearing officer stated, "I think I could always use the Building Department tables." He then told Owner's representative, "So if you would like, I won't allow this into evidence, if you object because it wasn't submitted seven days before but I will take judicial notice of it." At this point, Owner's representative said "Sure," and the hearing officer said he would give her an opportunity to look at the document.

Counsel for the tenants then turned to the receipts, invoices, and other documents evidencing expenditures and argued they did not add up to 50 percent of the comparative 2014 construction cost determined, according to counsel, by adjusting the Table A numbers with a ratio derived from Table B.

At the outset of Owner's summation, the hearing officer asked Owner's representative (Hart) to address the "new quarterly cost indexes" and the "propriety of using [them]." She responded:

"Hart: Well, I think that there is a standard that's been adopted by the Rent Board and used, not only for the convenience but also so that you're not going to have people running to the Building Department who don't actually know what they're looking for and asking the Building Department to tell them these calculations. In fact, I have another case where they went directly to the building department and there's an email trail and they weren't given that, they were given the Table A.

"[HO]: Well, what does that have to do with the propriety of my using this in my decision?

"Hart: I'm saying that there's a standard of evidence that the Board has adopted historically and that I could appreciate that this would seem more current[,] but at the same time I think it's not necessarily information that's generally available or that the Building Department, who is the source of this department [*sic*], provides in terms of these calculations."

Hart then asked for leave to file a post-hearing brief on the issue, since "it wasn't brought up earlier" and "was only brought up here in summary and now you're going to be using it as a—to bolster her evidence." The hearing officer responded, "I'm using it because this is what I'm supposed—one of the documents I'm supposed to be using," adding "I hadn't known about it before

16

today but anyway I'm going to use it." [9] Without a definitive response on the briefing request, the hearing officer closed "the record."

A week later, Owner filed a post-hearing brief. Owner first pointed out that then operative Oakland Municipal Code section 8.22.030 specified, "The average basic cost for new construction *shall* be determined using tables *issued by the chief building inspector* applicable for the time period when the substantial rehabilitation was completed" (Oak. Mun. Code, ch. 8.22, § 8.22.030, subd. (B)(2)(b), italics added), and maintained that while Table A was such a table, Table B was not. To illustrate and reinforce this point, Owner attached copies of not only what the parties had referred to as Tables A and B, but also a document Owner referred to as "Table C," entitled "Residential Building Minimum Valuation Data," effective February 1, 2001, and bearing the official signature of a city building official. Owner went on to assert "no evidence" had been presented to either authenticate or lay a foundation that the document being referred to as Table B (entitled "Quarterly Cost Indexes (1926=100)") was a table "issued by the chief building inspector." Further, because Tenants had not provided this document prior to the hearing, and because the tenants' counsel, while examining Harlan, stated several times she was not seeking to introduce the document into evidence, Owner had been deprived of the opportunity both to cross-examine Harlan and present additional evidence on the issue. Finally, Owner asserted taking "notice" of the document during closing summation

---

[9] The hearing officer did not explain why he concluded Table B was a document he was "supposed to be using." But presumably it was in light of the three hearing decisions to which the tenants' counsel had referred. There is no indication in the record that the hearing officer read these decisions, or that the Owner's representative or attorney had been able to review them.

had been improper, as the document was being used for its evidentiary value and it did not constitute a "fact or matter that is commonly agreed upon."

A little more than two weeks later, the hearing officer issued his decision. Under a sub-heading entitled "Building Services Evaluation Tables," (underscoring omitted) the decision stated:

> "The tenant requested the attendance of the City Building Services supervisor to testify with regard to how the City determines the present cost of new construction for the issuance of building permits. David Harlan, the Engineering Manager of the Bureau of Building appeared and testified at the Hearing. Mr. Harlan testified that his duties include oversight of all permit issuance, records management, and plan checking. He further testified that the City currently uses the table that was effective on August 1, 2009. A copy of this document is attached as Table 'A.' Official Notice is taken of two other documents issued by the City Building Services agency: 'Quarterly Cost Indexes (1926=100),' a copy of which is attached as Table 'B,' and 'Residential Building Minimum Evaluation Data,' a copy of which is attached as Table 'C.'" (Fn. Omitted.)

Under a sub-heading entitled, "The Calculation," (underscoring omitted) the decision stated in pertinent part:

> ". . . The Tables referenced in this Decision were all issued by the City Building Services agency.
>
> "Table 'A' lists square foot construction costs, effective August 1, 2009. However, since the construction in this case occurred in the year 2014, and costs have risen since that time, it is proper to increase the cost shown on the 2009 Table. The Building Services agency has recognized this fact, and therefore issued a document entitled 'Quarterly Cost Indexes (1926=100)' (Table 'B').
>
> "These tables are used as follows: (1) On Table 'B,' determine the number for the year of construction, geographical district, and type of construction; (2) Divide this number by the number in the same category for the year 2009. The resulting fraction is then multiplied by the number derived when the square foot cost shown on Table 'A' is multiplied by the number of square feet in the building."

18

The hearing officer alternatively ruled that even if the "square footage cost on the 2009 Table were used," the expenditures still did not meet the 50 percent requirement. He arrived at this conclusion based on a total square footage of 14,338, a number that included the square footage of the balconies. He then used a single construction cost number for the entire square footage, thus equating the cost of reconstructing the balconies with that of reconstructing interior living spaces.

Owner timely filed an administrative appeal raising, among other issues, the hearing officer's evidentiary use of Table B, and his total square footage number and use of a single per square foot construction cost number. In support, Owner attached several documents to its appeal notice, including an additional document Owner referred to as "Table E," entitled "City of Oakland Building Services Construction Valuation For Building Permits Effective February 5, 2007." (Fn. omitted.)

The Board affirmed on the ground "any error in considering the document addressing inflation adjustments to be applied to the table . . . would not change the result."

Owner timely filed an administrative writ proceeding. The trial court granted the petition.

The court (Judge Kimberly Colwell) first ruled the document the parties and the hearing officer referred to as Table B was not a table "issued by the chief building inspector applicable for the time period when the substantial rehabilitation was completed." It further ruled that even if the language of the ordinance allowed its use, the city had not made the document readily accessible to the public and thus the document could not be used to essentially sandbag owners who had made substantial property

19

improvements. The court (Judge Jeffery Brand) reaffirmed these rulings in the course of denying a motion for reconsideration.

We agree that the document referred to as Table B is not a table "issued by the chief building inspector applicable for the time period when the substantial rehabilitation was completed." This is illustrated by a comparison of the documents Owner attached to its post-administrative hearing brief and referred to as Tables A, B and C, and which the hearing officer, in turn, attached to his decision, as well as the document referred to as Table E, which Owner attached to its administrative appeal notice.

Table A bears the following heading:

"City of Oakland          Community Economic Development Agency

"Building Services          Dalziel Administration Building

"Construction Valuation          250 Frank Ogawa Plaza–2nd Floor

"For Building Permits          Oakland, CA 94612

"Effective Aug. 1, 2009          510-238-3891." (Fns. omitted.)

At the bottom of the document there is a website address for direct access to the document: \\Ceda=servers\ Building Permit Counter\COUNTER FORMS\Forms 2009_2010(Building valuation) Aug 1 2009. Thus, this document bears all the indicia of a city document and, specifically, of a table "issued by the chief building inspector." And Harlan confirmed, "Yes, that's the table that we currently use."

Notably, Table A also includes a footnote, footnote 1, in its heading, following "Construction Valuation." This footnote states: "Cost per square foot, unless noted otherwise. (l.f.=linear foot; s.f.=square foot); includes 1.3 regional multiplier (see Secc. 99 pg 6 July 2009 Marshall & Swift)." Other footnotes to column headings also provide for specific adjustments. For example, footnote 2 states: "Hillside construction=slope >20%; multiply by

20

additional 1.3 multiplier."  Footnote 3 states:  "Remodel Function of New Construction is a 0.52 multiplier."  In addition, Table A includes a column on its far right side entitled "Marshall & Swift 3Q 7'09 [¶] Section pg (Class/Type)."  Below that is a column of several dozen references, such as "Section 12 pg 25 (C/e)."  It is therefore apparent the building services department, indeed, makes use of data from private sources, such as Marshall & Swift.  But, as Table A also reflects, the department goes on to determine and specify exactly what multipliers are to be used for city purposes.

Table E bears a heading nearly the identical to that of Table A, but specifying an earlier effective date:

"City of Oakland             Community Economic Development Agency

"Building Services               Dalziel Administration Building

"Construction Valuation               250 Frank Ogawa Plaza–2nd Floor

"For Building Permits         Oakland, CA 94612

"Effective February 5, 2007    510-238-3891."  (Fns. omitted.)

It also bears, at the foot of the document, a website address for direct access to the document: \\Ceda-server3\building\Permit Counter\Permit FY06\(Building valuation).  Thus, like Table A, Table E bears all the indicia of a table "issued by the chief building inspector."

Although Table E also has footnotes, none make reference to any multiplier.  Nor does Table E contain an additional column of references to Marshall & Swift.

Table C is similarly entitled "City of Oakland Residential Building Minimum Valuation Data."  Immediately below the heading, the document is expressly "Approved by" a signature by Calvin N. Wong, "Building Official," and specifically states it was "effective February 1, 2001."  It also bears, at

21

the foot of the document, a web address for direct access to the document: "CARR\My documents\Forms\valuation-residential." Thus, Table C again bears all the indicia of a table "issued by the chief building inspector."

Table C also includes a prefatory paragraph similar to footnote one in Table A, stating: "The following building valuation data are based on cost and value reported in 'Marshal Valuation Services' published by Marshall and Swift and dated December 2000 with cost multiplier of 1.07 and local multiplier of 1.32." This again reflects that the building services department does use data from private sources, such as Marshall & Swift, but also determines and specifies exactly what multiplier is appropriate and is to be used for city purposes.

In contrast to Tables A (effective 2009), E (effective 2007) and C (effective 2001), Table B bears the caption "Quarterly Cost Indexes (1926=100)" and states in the upper right hand corner it is "Section 98 Page 7," followed by the date "October 2014." The footer states: "Marshall Valuation Service," (capitalization omitted) followed by a disclaimer that the "the data included on this page becomes obsolete after update delivery, scheduled for January 2015." (Italics omitted.) Below that is a copyright symbol, identifying "2014 CoreLogic,® Inc. and its licensors, all rights reserved." Plainly, this is not a city document.

Tenants maintain the language of the rent adjustment ordinance— "tables issued by the chief building inspector"—should be read to mean any document that can be characterized as a "table" and is "used" by the building department. Not only would such a construction be a departure from the plain language of the ordinance (see *MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1083 [words of a statute are generally to be given " 'a plain and commonsense meaning' "]),

22

such a construction would embrace any number of outside resources, an untenable reading given the specific language of the ordinance. (*Ibid.* [courts are to " ' "interpret legislation reasonably and . . . attempt to give effect to the apparent purpose of the statute" ' "].)

It is also understandable why the City specified that the comparative construction cost number was to be "determined using tables issued by the chief building inspector applicable for the time period when the substantial rehabilitation was completed." This provided a standard measure for construction costs that was easily applied. It also avoided the problem to which Harlan testified, that the exact cost of construction is ultimately a matter between the owner/developer and the contractor(s)/supplier(s), and not something in which the building services department gets involved. Rather, for its purposes, the department uses its own construction valuation table, which it periodically updates and which often, but not always, reflects the use of data from privately published sources.

Tenants claim it makes no sense and would be unfair to use Table A, effective August 1, 2009, to determine a 2014 comparative building cost number. As we have discussed, the record reflects that the building services department regularly updated its construction valuation table—in 2001, 2007, and 2009. It is not our role to effectively rewrite a local rent control ordinance because the department assertedly failed to update its 2009 table sooner than it did.[10] (See *In re I.A.* (2019) 40 Cal.App.5th 19, 23 [appellate court may not " ' "rewrite the clear language of [a] statute to broaden the

---

[10] We note that attached to a declaration by Harlan—submitted by the City in opposition to the writ petition but excluded by the trial court under section 1094.5, subdivision (e)—is another table identical in format to Table A, but with an effective date of May 1, 2015. Tenants have not challenged the trial court's evidentiary ruling excluding the declaration.

statute's application" ' "]; *L.G. v. M.B.*, *supra*, 25 Cal.App.5th at p. 227 ["court may not disregard the plain language of a statute just because the consequences of a literal interpretation are 'troubling' or because the court believes that a different approach would be better"].)

Further, Tenants have simply assumed, without any *evidentiary* basis, that using Table A would yield an unfairly skewed comparative construction cost number. Their witness, Harlan, refused to offer any such opinion, and no other *evidence* was presented on the issue. We also observe that since the department's construction valuation table is a revenue generating publication, as it determines building permit fees, it is equally reasonable to assume the department had, and continues to have, every incentive to ensure the version of the table in use is reasonably current and, at the time, had concluded no update was warranted.

Finally, Tenants refer to five administrative hearing decisions, copies of which were provided to the trial court by the City, in which varying versions of the Marshall & Swift quarterly indices were used. As we have recounted, during summation in the administrative hearing, the tenants' attorney referred to three of these decisions.

On appeal, Tenants characterize these hearing decisions as an administrative interpretation of what constitutes a "table[] issued by the chief building inspector" that should be given deference.

Four of these hearing decisions were issued by a single hearing officer. In each, the hearing officer used a city construction valuation table (e.g., Tables A, E, C) that was *not* in effect for the period during which the rehabilitation work was done, but was in effect during a *later* period of time.[11]

---

[11] In *Young v. Beasley* (a decision dated June 13, 2008), the construction work was done between 1998 and 2000, but the hearing officer

24

Stating this was "unfair" to the owner because costs had increased, the hearing officer then used varying versions of the Marshall & Swift quarterly cost indices to adjust the construction costs set forth in the more recent tables downward. What is immediately clear is that the hearing officer used the incorrect construction valuation table to begin with—as the ordinance required use of the table "issued by the chief building inspector *applicable for the time period when the substantial rehabilitation was completed*," not a version of the table applicable during a later time period. The record before us does not reflect why this occurred. Nor does it indicate whether, given the use of plainly inapplicable valuation tables, the parties agreed to using indices to adjust the cost number derived from these inapplicable tables downward.

The remaining decision is one by the hearing officer who decided the instant administrative matter, issued a little over two weeks after he issued his decision in this matter. In short, the hearing officer reemployed, almost verbatim, the approach he had used only weeks earlier here.

Accordingly, these hearing decisions carry little weight as an interpretative matter. " 'How much weight to accord an agency's construction is "situational," and greater weight may be appropriate when an agency has a " 'comparative interpretive advantage over the courts,' " as when " 'the legal

_____

used the version of the department's valuation table dated February 5, 2007. In *Weinberg v. Tenant* (a decision dated December 3, 2013), the construction work was done in 1991-1992, but the hearing officer used the version of the department's valuation table dated August 1, 2009. In *Promes v. Fehr* (a decision dated December 16, 2013), the construction work was done between 2003-2004, but the hearing officer used the version of the department's valuation table dated February 1, 2007. In *Cordaro v. Tenants* (a decision dated July 18, 2017), the construction work was done in 2010, but the hearing officer used a version of the department's valuation table dated February 1, 2017.

text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion.' " ' " (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 911 (*Boling*).) The ordinance language at issue here is not technical, obscure, or complex. Furthermore, the four decisions by the one hearing officer all involved a set of circumstances unlike that here, and in the absence of the records in those matters, we are at a loss as to why the hearing officer used versions of the City's construction valuation table that were *not in effect* at the time of the reconstruction work but were in effect for a later time period. We likewise have no way of knowing what the hearing officer and the parties may have discussed in terms of adjusting the cost numbers using Marshall & Swift indices. The fifth decision, by the same hearing officer who presided here, barely two weeks after his decision in this case, likewise is of scant interpretative significance.

In any case, the interpretation of a local ordinance is a question of law, ultimately committed to the courts. (*Boling, supra,* 5 Cal.5th at p. 911.) And for the reasons we have discussed, we agree with the trial court that the privately published Marshall & Swift quarterly cost indices are not "tables issued by the chief building inspector," and that the hearing officer erred in using what has been referred to as Table B for evidentiary purposes to determine the comparative building cost.[12]

---

[12] We therefore need not, and do not, consider the trial court's additional ruling that even if the ordinance did permit utilization of such document, its use, on this record, impinged on the Owner's due process rights. That said, the manner in which tenants' counsel deployed and then argued the evidentiary value of Table B was improper. Likewise, the hearing officer's about-face from its prior ruling, allowing use of Table B only to refresh Harlan's recollection, and belated acceptance of Table B for

In their appellant's opening brief, Tenants made no follow-up argument that even if the trial court's ruling as to Table B was correct, reversal is nevertheless required because even if Table A were used to determine the comparative construction cost (and even if different square footage costs were used for the interior and balcony spaces), Owner's rehabilitation costs did not meet the 50 percent requirement. However, in their reply brief, Tenants devoted four pages to advancing this argument. It is well-established that an appellate court generally will not consider arguments raised for the first time in a reply brief, and we decline to do so here. (See *WorldMark, The Club v. Wyndham Resort Development Corp.* (2010) 187 Cal.App.4th 1017, 1030, fn. 7 ["Arguments raised for the first time in the reply brief are untimely and may be disregarded."])

Indeed, Tenants have not, in advancing this new argument in support of reversal, been candid about the record. This new argument turns on the total amount Owner spent on rehabilitation costs. As the following procedural recitation reflects, it is apparent to us that the trial court viewed the cost issue that had been raised by Owner as having been resolved by a concession by the City.

In its administrative appeal, Owner asserted the hearing officer had made a "calculation error"—specifically, that the total amount paid to the principal contractor (Martin Gallagher Construction, Inc.) set forth in the hearing officer's decision was off by $26,000, and that the correct amount paid to the contractor, as shown by invoices and proofs of payment, was $857,596, rather than $831,597 as stated in the decision. The Board did not address the issue, since it upheld the decision on another ground.

---

evidentiary use during summation after evidence was concluded, is also of significant concern.

27

Owner continued to raise the asserted $26,000 calculation error in the trial court.

In their opposition to the writ petition, Tenants included a half-page argument that the hearing officer had "considered" the invoices pertaining to that contractor's work, pointing out the hearing officer's decision "listed" the pertinent exhibits. Tenants did not respond, however, to the Owner's point—that the amounts set forth in those exhibits did not add up to the number in the hearing officer's decision, and that that number was short by $26,000.[13]

The City, however, did address the Owner's claim of a computational error and conceded "the invoices that the hearing officer used to reach this amount actually total $857,597—as Hyde Street argues. (Tab 26 AR 122 (footnote 4).)"

The trial court, under a separate heading entitled "$26,000 IN INVOICES," then stated in its decision: "The City acknowledges that the Hearing Officer and Board appear to have made a calculation error." It observed "[t]his error did not affect the Board's decision." Likewise, "[t]he apparent $26,000 calculation error does not affect the court's decision on the petition."

It would have made no sense for the trial court to have spent many pages addressing the merits of the principle issues—the use of Table B and

_____

[13] This is basically the same argument they have belatedly advanced in their reply brief—that the hearing officer identified the pertinent invoices and thus "considered" them. They then baldly assert he "found (correctly)" total expenditures of $850,441 and point out half of this amount is less than 50 percent of the Table A comparative cost number. They never, however, address the real issue—that the hearing officer made a mistake in adding up these invoices. Rather, they quibble over the Owner's use of the word "disallowed," claiming the contractor's work was not "disallowed," pointing out, again, that the hearing officer identified and thus "considered" the pertinent invoices.

the use of a single construction cost number for the entire square footage—and to have issued a remand order, if this was all simply an academic exercise, as Tenants now belatedly claim, because the total rehabilitation costs do not meet the statutory requirement even assuming use of Table A and use of different cost numbers for the interior and balcony square footages.

Appellant Garcia then moved for "reconsideration." In his 20-page, supporting memorandum, he addressed the following: the trial court's ruling that the hearing officer had improperly used Table B, the court's grant of the motion to augment the administrative record with the missing "Brief on Appeal" , and the ruling that the hearing officer, and Board, had improperly applied a single construction cost number to the entire square footage (i.e., both interior spaces and balconies). The memorandum concluded with an assertion that if the trial court persisted in its rulings, it would "cause the court to be disqualified" under Code of Civil Procedure section 170.1. Notably, the motion for reconsideration also did not advance the claim that even if the challenged rulings were all accepted as correct, no writ should issue because Owner's total rehabilitation costs still did not meet the exemption requirement.

As Owner pointed out in opposition, the motion for reconsideration did not comply with statutory requirements, as Garcia was merely taking issue with the merits of the trial court's decision and rearguing the case. (Code Civ. Proc., § 1008; *Shiffer v. CBS Corp.* (2015) 240 Cal.App.4th 246, 255 [motion for reconsideration must be " ' "based upon new or different facts, circumstances, or law" ' "].)

The trial court denied the motion for reconsideration as procedurally improper (no "new law or fact"), and further ruled that even if the court reconsidered the issues, it would reach the same conclusions.

In sum, in light of the above, and in light of the trial court's broad remand order, it seems apparent to us that the trial court viewed the computational error issue as having been resolved by the City's concession and thus of no consequence to its order remanding the matter for reconsideration in light of its rulings.[14]

## DISPOSITION

The trial court's judgment is AFFIRMED.

---

[14] We note that in the "Statement of the Facts" (some capitalization omitted) in its respondent's brief, Owner discussed the evidence supporting its exemption petition and stated the hearing officer "understated the amount spent by the owner," specifically the amount paid to Martin Gallagher Construction Inc., by $26,000. (Italics & boldface omitted.) Given our recitation above, this statement is understandable. Owner made no further mention of the point and devoted the "Argument" section of its respondent's brief to addressing the Table B ruling and augmentation order challenged by Tenants.

_____

Banke, J.

We concur:

_____

Margulies, Acting P.J.

_____

Sanchez, J.

A156463, Hyde Street CNML Props., LLP et al. v. City of Oakland's Department of Housing and Community Development Rent Adjustment Program